IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 149 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| HASAN R. EDMONDS | ) | |

## NOTICE OF FILING

TO:    Barry Jones                       Troy Grooms
         Assistant United States Attorney    United States Probation Office
         219 S. Dearborn Street, 5th Floor    230 S. Dearborn St., Suite 3400
         Chicago, Illinois 60604              Chicago, Illinois 60604

**PLEASE TAKE NOTICE** that on this 5th day of August, 2016, the undersigned filed the following document(s) in the above-captioned cause, a copy of which is attached hereto.

- **DEFENDANT'S SENTENCING MEMORANDUM**

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook
Executive Director

By: _s/ Paul Flynn_
      Paul Flynn
      Attorney for Defendant

PAUL FLYNN
Federal Defender Program
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-2030

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 149 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| HASAN R. EDMONDS | ) | |
| | ) | |

### <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Defendant, HASAN R. EDMONDS, by the Federal Defender Program and its attorney PAUL FLYNN, states the following as and for his Sentencing Memorandum:

**I.    INTRODUCTION**

Mr. Edmonds pleaded guilty to two counts of conspiring to knowingly provide material support to a designated terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). The statutory sentencing maximum for both counts is thirty years' incarceration.

For the reasons set forth in this memorandum, counsel suggests a sentence of fifteen years' incarceration followed by an extended period of supervised release. Such a sentence is reasonable and in accord with the objectives of sentencing.

**II.    APPLICABLE LEGAL STANDARD**

District courts have discretion in determining sentences according to the provisions of 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 259-60 (2005). Section 3553(a)(2) states that a district court should impose a sentence "sufficient, but not greater than necessary . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed . . . training, medical care, or other correctional treatment."

1

Section 3553(a) further provides that the district court should weigh factors such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; "the [applicable] sentencing range[;]" the articulated policy goals of the guidelines; "the need to avoid unwarranted sentence disparities" among similar defendants; and "the need to provide restitution to any victims of the offense." § 3553(a)(1), (3)-(7).

The Supreme Court has consistently maintained that the range prescribed by the now-advisory Guidelines is but one of the sentencing court's considerations – "a starting point and initial benchmark" – and that the court must weigh all relevant Section 3553(a) factors to "make an individualized assessment based on the facts presented." See *Gall v. United States*, 552 U.S. 38, 50-52 (2007); *Pepper v. United States*, 562 U.S. 476, 491-92 (2011).

## III.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.   *Hasan Edmonds' Background*

Hasan Edmonds has a family story that is all too familiar to this Court. Growing up, Hasan was a constant witness to violent physical and mental abuse perpetrated by his father who was a gang member and a drug addict. The violence and cruelty exhibited by Hasan's father was so severe that it culminated in Hasan's mother shooting his father when she refused to be forced into prostitution by him.

Hoping to provide a better life for Hasan, his cousin, Jacquiline McKinley, assumed custody of Hasan and his younger sister, Manchinique Bates. Under the care and guidance of his cousin and his grandmother, Labertha Bates, Hasan was raised as a Christian. Despite the initial tumultuous and hostile relationship Hasan had with his father while growing up, the two reconciled and began living together in Georgia in approximately 2008. While living with his father, Hasan became interested in Islam - a religion his father converted to while in prison.

2

Seeing the profound positive effects that Islam had in transforming his father, Hasan eagerly embraced the religion as his own.

Hasan eventually moved back to his grandmother's house in Aurora, Illinois. Not wanting to live a life of crime like his father had and filled with a desire to serve his country, Hasan subsequently joined the Illinois National Guard. By many accounts, Hasan was not only a good soldier, but a trustworthy and dependable friend to others on the base.

### B. Hasan Edmonds Was Under the Influence of Jonas Edmonds

After examining the testimony, interviews, and statements of witnesses, both for the Government and for Hasan, one incontrovertible theme pervades them all: Hasan looked up to and was overwhelmingly influenced by his cousin, Jonas Edmonds.

When one considers the tumult and lack of structure that pervaded Hasan's childhood, it should come as no surprise that Hasan naturally gravitated toward both the military and Islam, both of whose rituals and requirement of rigorous devotion parallel and complement each other. The significant and fatal difference between his induction into both religion and military service is found in the guidance he received. While the National Guard provided Hasan with professional training and expert leadership, Jonas Edmonds afforded Hasan no such benefit.

To say that Hasan's involvement with Islam took a wrong turn would be a gross understatement. A major tenet of Islam is the obligation to better learn and understand the faith. To accomplish this, Muslims seek out other, more learned Muslims to guide them on this journey. However, as we in society have unfortunately borne witness to countless times, religious guidance provided by the wrong teacher can have devastating effects. The case of Hasan and Jonas Edmonds is a bright example of this. Though he developed a foundational perception of the religion through his father, Hasan also sought religious counsel from his

cousin. Under the guidance of Jonas Edmonds, Hasan became exposed to a thoroughly distorted and radicalized version of Islam, a far cry from the peaceful and contemplative version the vast majority of Muslims practice.

A religious novice and woefully unaware of his cousin's many shortcomings, Hasan accepted everything Jonas said as fact. Hasan reasoned that because Jonas was older, had "studied" Islam for a longer time, and understood some Arabic, Hasan should follow and accept Jonas' as an Islamic scholar – a truly regrettable decision.

Of particular note with respect to Jonas' dominance over Hasan's religious education, is that both Hasan and Jonas admit to Hasan's following of Jonas. In speaking to UC1, Hasan specifically mentioned that he did not adopt his current views on Islam and the Islamic State until Jonas entered the picture. HESS_001-000028. Jonas was the sole source of any religious information that Hasan received including developing the desire to "swear allegiance to the khalifa" and travel to the Islamic State. HESS_001-000065.

From the hours of recorded telephone calls, as well as the hours of monitored conversations with undercover agents, it is undeniable that any "radical" or "militant" concepts of Islam originated either directly from the mouth of Jonas Edmonds, or were contrived from radical videos and articles disseminated by him. Even by his own admission, Jonas Edmonds was the driving force in "leading this charge into darkness." 1D 001(2).

While discussing his understanding of Islam with an undercover agent, Hasan talked about how he was attempting to become a helicopter pilot before Jonas Edmonds "show[ed] me what Islam was."1D 3, File 7. He further discussed how Jonas Edmonds was the first person to inform Hasan about the creation of the Caliphate and encourage him to join. Id. This is a theme repeated over and over again throughout nearly every interaction between Hasan and his cousin.

Hasan was a young, impressionable Muslim who had recently committed to Islam. It was only through Hasan's own naivety and religious aspiration to live a more pious life that he became infected by his cousin's distorted and ultimately destructive visions. Although Hasan's radicalization took place over an extended period of time, in truth, the criminal actions are aberrational and entirely out of character. Much more indicative of his character and true moral code are his lack of any prior criminal or violent acts, his ready acceptance of responsibility for his crime, and amenability to change. Simply put, but for Jonas Edmonds' fanaticism, Hasan would most likely have continued down the path of an honorable soldier and model citizen.

## IV.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

Hasan fully understands and accepts that he should and will be held accountable for his actions. However, any characterization of his offense as being in any way "worse" or more substantial than Jonas Edmonds' is both unfounded and incorrect. While it is generally held that actions speak louder than words, in this case, it is *inaction* that speaks volumes. The bedrock principle of our sentencing system is that an individual is punished for his actions – what actually happened - and not the speculative "worst case" scenario that *might* have happened. As Minnesota District Court Judge John R. Tunheim poignantly articulated in a sentencing memorandum justifying his more lenient sentencing of an individual convicted of violating the same material support statute at issue here, "[T]his Court's role at sentencing is not to construct the darkest possible interpretation of a defendant's conduct and potential and then sentence the defendant as if that interpretation is truth." *United States v. Warsame*, 651 F. Supp. 2d 978, 981 (D. Minn. 2009).

The press coverage of this case would have the public and this Court believe that its actions prevented another massacre similar to the one seen at Fort Hood in 2009. This could not be further from the truth. If Hasan had any deep seated intention of inflicting the type of

carnage that had been talked about, he could have done it himself. He worked in an armory. He had a valid FOID card. He was well trained in utilizing weapons He had the means, opportunity, and ability to carry out such an attack, but he did not. He did not even attempt it. Instead of participating in any attack, either on the base or elsewhere, Hasan attempted to get on a plane to leave this country in the hope of reaching what he thought would be religious paradise.

The actions that Hasan admits to, and what he fully accepts responsibility for, are a direct result of his poor choices; his choice to attempt to travel to the Islamic State and his choice while engaging in boisterous and hyperbolic conversations with Jonas Edmonds and undercover agents to provide information about the base layout where he was employed.

### A. Significance of the Information Provided

With respect to the conversations between Hasan, Jonas, and the undercover agent, the Government incorrectly over states the case that the information provided by Hasan was both substantive and material to any plot that would have taken place. Contrary to the Government's assertions, the information that Hasan provided was not particularly unique, nor particularly valuable, especially in light of the manner in which it was delivered.

The information in question, as well as the events that constitute the most significant foundation for Count One of the indictment, occurred on March 24, 2015. On that day, Jonas Edmonds, UCE, and Hasan traveled to the Joliet National Guard base. There, Hasan retrieved a copy of the training schedule for the base and provided Jonas Edmonds and UCE with information about the base. These are the undisputed facts that Hasan has already admitted to. The task for this Court is to determine the significance of that information in relation to Hasan's ultimate culpability.

6

Examining the totality of information provided by Hasan, including both its substance and delivery, it is apparent that the foundation for this plot was manifestly insubstantial. In the first place Hasan Edmonds was not party to the conversation in which the undercover agent and Jonas Edmonds planned the trip to the National Guard base. His first question when he got in the car that fateful morning was "Where are we going?". His comments were a reaction to a plan already set in motion for the day by the UC and Jonas.

To begin with, the only information given in physical form by Hasan was a copy of the training schedule for the base. All other information was given verbally. This is significant because it demonstrates an utter lack of substantive planning on the part of the conspirators" The Government portrays Hasan's description of the base as extensive and contends that his providing of it was illustrative of the clear intent of all the individuals involved to ultimately carry out this plot. A plot that the Government maintains was well orchestrated and planned by Jonas and Hasan Edmonds. The Government's position is that this plot hinged on this "insider" information. That theory however, crumbles once light is shined on who these masterminds actually are.

Jonas Edmonds was a prolific marijuana user, a fact known to Hasan and established by the plethora of government-recorded phone calls to his drug dealers that occurred with great frequency often multiple orders in a single day. Further, as Jonas has admitted, he consumed marijuana on a regular basis including on the day the three "surveilled" the base. The importance of this information is that for the lengthy sentence the government asks to be imposed, the Court would have to accept the Government's painting of this plot as being advanced, sophisticated, and feasible and that the defendants were terrorist masterminds.

The reality is that Hasan spent minimal time explaining the base to an impaired Jonas Edmonds and a passive UCE, neither of whom were taking notes. Further, Hasan left no notes,

7

maps, instructions, or additional information of any kind related to the base when he attempted to leave this country. The recipe for a sophisticated and well-planned plot does not include having the only person, with substantive and material information, exit the country without leaving any of that information behind. Were Jonas Edmonds and the UCE supposed to remember exactly which hallways they should and should not go down, or which doors they should avoid, at some later point in time when and if they decided to actually follow through with such a plan?

### "Expert" Advice

Another position the government takes is that the information that Hasan provided on that day constituted "expert" advice on how to attack the National Guard base. While the statements made by Hasan are undeniably off-putting, hardly any of the information given by him contained any unique or practical qualities. For instance, his advice to shoot the "stripes first" is not a revolutionarily insightful tactic that Hasan exclusively acquired through his specialized training in the military. Rather, it is an approach that any novice with a copy of Mel Gibson's *The Patriot*, or similar war epic made in the last fifty years, could see being readily employed.

The most significant piece of information that Hasan provided on the day of March 24, 2015, was the fact that the guardsmen would not be armed while conducting drills. This information is, admittedly, pertinent to such a plot. However, there is no indication that this information is "secret" or "privileged" in any way, and could not have been obtained during a casual conversation with any Guardsman. Just because information could be utilized in a plot, does not mean that that information is not disclosable or should carry disproportionate weight when determining culpability.

8

Another example of this supposedly expert advice occurred when Hasan was electronically communicating with UC1, whom Hasan believed to be an ISIS fighter in Libya. He advised UC1 that the best way to beat the American army was to "break their will" and "discover the routes [of] the convoys." HESS_001-000130-33. While Hasan may have thought at the time that he was being valuable, it does not take a three-star general to know that this advice is hardly ground-breaking.

Even some of Hasan's more specific assistances such as his offering of a list describing what stripes correspond to what rankings is anything but exceptional. Such information can be alternatively and effortlessly procured in mere seconds by a Google© image search or watching reruns of F Troop.

The narrative here is clear – Hasan was not nearly as helpful to any plot, or as harmful to our country, as the press would have this Court and the public believe. Likewise, Hasan should be punished for what he specifically did, and not for vague concepts that are augmented and aggrandized to appear more substantial than they are.

## V.     THE AUTOMATIC APPLICATION OF THE TERRORISM ENHANCEMENT

Pursuant to USSG § 3A1.4, the "terrorism enhancement", every offender's sentencing offense level is increased by 12, and their criminal history category becomes a level VI. The enhancement is applied regardless of whether any acts of terrorism are committed; regardless of whether any violence is involved; and regardless of whether the individual has ever been convicted of a crime. These enhancements are not supported by any empirical research. In Hasan's case, the enhancement exaggerates both his conduct and criminal history. The Court should remedy this by imposing a below guideline sentence to avoid an unjust sentence.

9

A.     *The Terrorism Enhancement Should be Remedied in Light of § 3553(a) Sentencing Factors*

With regard to sentencing those who violate the material support statutes, the United States Sentencing Guidelines provide for substantial punishments. Under U.S.S.G. §2M5.3, the base level for a violation of § 2339B would be 26. While fairly severe in its own right U.S.S.G. §3A1.4 the "terrorism enhancement." §3A1.4 provides that:

> Terrorism (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32. (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Based on a preliminary calculation, and without factoring in any offense-specific characteristics which may raise or lower the range, a violation of §2339B automatically results in a violation level of 38 and a criminal history category VI, which carries a recommended guideline range of 360 months to life incarceration. Despite this recommended sentence, the statute itself limits the sentence to 15 years (180 months') incarceration. In terms of sentencing, this provides the Court with an identical recommended minimum and maximum sentence, namely 180 months' incarceration..

While severe, the Guideline recommendation (based on the offense level coupled with the statutory limit of the offense itself) can arguably be reasonable, as deference should be given to the Unites States Sentencing Commission who proposes and promulgates these guidelines and their respective sentences. That deference, however, should not be all-encompassing, as unreasonable results can occur. Such an unreasonable result exists in not only the application of U.S.S.G. §3A1.4, but in the guideline itself.

### B. Hasan Edmonds' Criminal History is Grossly Overstated

Although the calculation of Hasan's sentence guideline is technically correct, it nonetheless dramatically, misleadingly, and unfairly overstates his career criminal category to a staggering degree. As an initial matter, it is undisputed that Hasan has no criminal record. Hasan has been a law-abiding citizen throughout his life, and has always conducted himself in a peaceful, non-violent way.

Thus, the unreasonableness within the Guideline pertains to its automatic increase in the offender's criminal history category to VI, irrespective of any actual criminal history. This action equates a first-time offender to a serious habitual offender and consequently recommends a sentence as if they were the same person. Examining this notion at face value, it is an affront to reason that a system concerned with punishing unique individuals for their unique crimes would allow a guideline that groups vast sets of offenders, all with distinctive histories and characteristics, into one artificial "terrorist" mold. Even more troubling is the fact that many of those, like Hasan, whose only crime was the one charged are grouped together with habitual offenders. How can this be reasoned?

The Second Circuit attempted to answer that question in *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), when it held that, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." What the holding in *Meskini* essentially articulates is that, while an offender's sentence is supposed to be tailored to that individual, terrorists, and would be terrorists though still unique individuals, are all the same. The holding in *Meskini* pronounces and perpetuates a politically-driven

11

hysteria that calls for us to abandon reason and common sense and to embrace fear when we are faced with all of these "terrorists".

While the court in *Meskini* flatly rejected the argument that automatically applying a criminal history category VI to any person who qualifies for a U.S.S.G. §3A1.4 enhancement is unreasonable, it does not preclude the necessity for that argument to represented here. The line of reasoning by the Second Circuit baffles the mind. Concluding that every person categorized as a "terrorist" possesses identical traits with each other would be analogous to paralleling a misguided youth who robs one bank with Jesse James. Or equating an 18-year-old charged with statutory rape for having a sexual relationship with his 17-year-old significant other with Jerry Sandusky. To treat all "terrorists" as one entity not only erodes the foundation of our judicial system, but also destroys the system's ability to address offender-specific traits that make one individual peruse one form of "terrorism" to another.

C.    *Double-Counting*

What makes the application of the terrorism enhancement, U.S.S.G. §3A1.4, in specifically defined terrorism related offenses is that it double counts the same elements of the initial crime which results in an individual being punished twice for the same elements of the crime. All terrorism crimes would, by definition, require there to be a terrorism enhancement on top of the initial sentencing Guideline recommendation. That is akin to saying that it is a crime to give money to Democratic or Republican candidates and an enhancement that targets any activity that promotes the furtherance of the Democratic or Republican Party.

The Seventh Circuit has held that "double counting" in sentencing is permissible unless the specific guideline instructs otherwise. *United States v. Vizcarra*, 668 F.3d 516, 518 (7th Cir. 2012). However, this case is distinguishable because *Vizcarra* addressed "distinct" conduct that can be attributed to multiple enhancements. This particular enhancement does not address

12

specific conduct but purely general conduct. It takes a violation of a statute that is exceedingly broad on its face, and applies an accompanying enhancement that is equally expansive and also necessary for every instance of conviction under the initial violation.

Material support and resources is a broad term that courts have held encompasses a plethora of actions including: a) actively recruiting young jihadists (United States v. Bell, 81 F. Supp. 3d 1301 (M.D. Fla. 2015)); b) actively training at terrorist training camps (United States v. Warsame, 651 F. Supp. 2d 978, 981 (D. Minn. 2009)); c) attempting to bring night vision goggles to Hezbollah (United States v. Assi, No. 09-1021, 428 F. App'x 570 (6th Cir. June 30, 2011)); d) threatening to blow up a federal building (US v Parr, 545F.3d 491 (7th Cir. 2008).

The application of this enhancement with regard to the underlying statutory violation applies a broad concept on top of another broad concept and violates the individual's Eighth Amendment's protection against disproportionate sentences by way of its indiscriminate application to all material support violations.

There would clearly be those who would support such a scheme, a more reasonable interpretation is that such a situation is inherently imbalanced and results in arbitrarily severe punishments. Other courts have justified the application of the terrorism enhancement by again noting some inherent distinction between "terrorists" and other criminals. The Fourth Circuit held that, "[T]he terrorism enhancement is doing just what it ought to do: Punishing more harshly than other criminals those whose wrongs served an end more terrible than other crimes." *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008).

Applying the reasoning of the Second and Fourth Circuits, the Government's position becomes clear: "terrorists" are identical; their crimes are identical; and, those crimes are "more terrible than other crimes." But in the instant case, we see that that concept is not universal. Prior to this offense, Mr. Edmonds was not a criminal. Not only was he not a criminal, he was a

13

good citizen. Hasan has acknowledged the seriousness of his offense and respect for the law by admitting and taking responsibility for his crimes and pleading guilty. Through these actions, Hasan has distinguished himself by showing that he is capable of reform, willing to make the right choices even if they have severe consequences, and that he is no danger to society. A just punishment, therefore, should take into account that he is still in the early stages of his life, fully capable of reform, has renounced ISIS, and after an undoubtedly impactful prison sentence, someone who is capable of making a meaningful contribution to society.

### D. *Hasan Edmonds is Not likely to be a Recidivist.*

Several factors suggest that Edmonds will not reoffend. First, he is a true first-time offender, with no prior arrests or convictions. According to the Sentencing Commission, true first offenders, i.e., those with no prior contact with law enforcement, recidivate less.[3] This is the first brush with that Hasan Edmonds has encountered with the law. He has zero criminal history point.

His illegal conduct does not appear to be in any way the result of a criminal mind; his offense occurred at a time of great vulnerability and was an aberration for him. The offense occurred as a result of watching ISIS propaganda videos and his previous belief that the Muslim world was under a broad attack.

Probably the most powerful indicator of Edmond's extremely low risk of recidivism is the profound shame, and remorse he has experienced as a result of his actions. No one is more

---

[3] See Recidivism and the "First Offender," May 2004 Report of the United States Sentencing Commission at 17, available at www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_First_Offender.pdf ("Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all.").

disappointed in Edmonds than he is in himself. He feels like he let so many people down, people he considered his friends. The disappointment he has caused in his friend, his family and most significantly himself, is not something Edmonds ever wishes to repeat.. It has most certainly taught him a lesson he will never forget and never wants to experience again. Exhibit A.

Dr. Stephen Xenakis M.D. LLC, a certified psychiatrist and retired brigadier general in the United States Army evaluated Hasan Edmonds to determine if Mr. Hasan's thoughts about fighting for ISIS or attacking the Army National Guard installation in Aurora Illinois had changed and if Mr. Edmonds was likely to become a recidivist. His conclusion was that it was not likely to a reasonable degree of scientific certainty that Hasan Edmonds would re-offend.

Dr. Xenakis has extensive experience interviewing terrorists and those accused of providing material support to ISIS as well as other organizations designated by the president to be engaged in terroristic activities. He has interviewed and reviewed medical and psychiatric records of both those captured and held at Guantanamo as well as others detained elsewhere.

After reviewing the discovery materials in this case, and performing his psychological assessment of Hasan Edmonds it is his expert conclusion that Mr. Edmonds no longer has any interest in supporting violence committed by groups or agencies in Syria or surrounding territories or engage in similar action. Mr. Hasan's current interests are in exploring and understanding his faith and pursuing higher purposes in life. He specifically further concluded that Hasan Edmonds hasn't any interest in supporting or affiliating with ISIS or in attacking the National Guard installation or committing any equivalent violent acts.

15

## VII.    CONCLUSION

WHEREFORE, in light of the foregoing reasons, Defendant Hasan Edmonds asks this Court to impose a sentence of 15 years' incarceration followed by an appropriate period of supervised release.

Respectfully Submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook
Executive Director

By: *s/ Paul Flynn*
PAUL FLYNN
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, IL 60603
(312) 621-8300

Assisted by:
Anton Trizna, Legal Intern
Loyola University Chicago School of Law

## CERTIFICATE OF SERVICE

The undersigned, Paul Flynn, attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## DEFENDANT'S SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on August 5, 2016, to counsel/parties that are non-ECF filers.

Troy Grooms
United States Probation Office
230 S. Dearborn St. – Suite 3400
Chicago, IL  60604

FEDERAL DEFENDER PROGRAM
Carol A. Brook
Executive Director

By: *s/Paul Flynn*
Paul Flynn

PAUL FLYNN
Federal Defender Program
55 E. Monroe St., Suite 2800
Chicago, IL  60603
(312) 621-2030

# EXHIBIT A

April 21, 2016

# Convalescence

I have reflected much and learned a great deal about myself, my faith, and the world we live in today during this incarceration. The one question that has stalked my every waking thought, and sometimes my dreams is, how in the world did it come to this and how did it get this far? The general consensus upon first glance would be to conclude that I am some 'religious extremist' who hates Americans and holds no love for my country. But upon a deeper observation, you will find that this conclusion is far from accurate. This assumption concludes that I am a Muslim living in America, when in fact, I am an American born and bred, who just so happens to be Muslim. My thoughts, mannerisms, and general outlook on life are all very much so Americanized; even in this situation, which seems so far astray. I do not hate Americans, nor am I an inherently violent man, who wishes death and destruction on my so-called 'enemies'. Only those who have never seen war wish for it.

My involvement in this debacle is a mixture of confusion, guilt, anger, idealism, and naiveté. In hindsight, it appears I have jeopardized my life and my freedom for what was tantamount to a fool's errand. And though I love my faith dearly; I've realized that retarded resistance is only a means of destruction, not only of self, but also of the innocent swept away in the melee.

This letter is supposed to express how much I regret my decisions and how I'd never do something like this again. These two objectives are not very hard at all, given that to this very day I still have trouble comprehending how I ended up here in the first place. I'm no criminal; I never imagined I'd see the inside of a jail cell... The phrase, hard pill to swallow doesn't quite articulate the pain. Though I do not believe that jailing a risk Muslim youth will help solve the issue in any shape, form, or fashion. I am glad that I did not go, as the outcome could've been much more tragic. Looking back, I can see several routes that could've been taken during this arc of a story by all parties involved that had the potential to divert this sad affair. To be clear, I am not attempting to scapegoat or point fingers; I take full responsibility for my actions or lack thereof. I realize that violence only begets more violence, that bloodshed only leads to more bloodshed, and that there is no glory, beauty, or honor in destruction simply for destructions sake. I've also come to understand that the path the government has taken to combat this juggernaut is one that leads to a dead end. I have endeavored to make this letter as apolitical as possible, yet I must insert that the only way to counteract 'radicalized Muslims' is with Muslims, not against them. Handing down stiff penalties and attempting to throw every so-called 'jihadist' under the jail will not eliminate the problems; in fact, it only powers fuel on the fire and serves to augment it. I know this to

1

be fact because, although placing me in jail succeeded in separating me from the propaganda machine that is the Islamic State. It took the imams visit and his imputing upon me words of wisdom and insight for me to be able to step back, analyze the situation, and see through the smoke screen. This bore in mind, I would not be a man, Muslim or otherwise, if I did not use this time to reach out to others battling the same troubles I faced. This is my penance, my vindication, and my contribution to humanity; all I ask is for the chance to do so. This is a unique moment in time and a very pivotal moment in the storyline of not just America, but also of the human race. If groups like the Islamic State or their war mongering opposites have their way, I'm afraid that the violence that has already taken place would have only been a prelude for more drastic and savage events that will inevitably unfold as history repeats itself and the mindless violence takes its toll. Now more than ever, we need calm and reasonable minds in positions of authority to make just and logical decisions, so as to set the tone for the rest of the nation to follow. I understand that for a man in your position, given the high profile status of this case and it's politically charged nature, that there may be many professional and social external pressures lobbying for you to throw the book at us; as to set a stern example, I ask that you look past the biases that may be leveled against us to the facts at hand. I harmed no one because I am not some crazed terrorist with a personal agenda of mayhem and destruction. But rather, I am a young man who was temporally led astray by the hateful rhetoric of a group who I reality could care less about the religion they claim to represent or the people they swear they wish to protect.

In truth, Isis is more concerned with the manipulation, oppression, and in some cases eradication of those they deem unworthy. By no means could I ever cosign such madness and blatant barbarism. I hope to extend and olive branch, not only to those battling the inner turmoil of trying to find the right path, but also to those who would lend an ear. This is me reaching and speaking out from the other side of the street, the other side of the gun, the other side of the vest. Together, we can begin to combat this global virus from all sides; if you would but give it a chance. Otherwise, I fear for our collective futures. With time and a lot of hard work perhaps we can make the masses realize that "the price of hating other human beings, is loving oneself less."

2