UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 15 CR 149-1 |
| v. | ) | |
| | ) | Hon. John Z. Lee |
| HASAN EDMONDS | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

**I.  INTRODUCTION**

In September 2011, defendant Hasan Edmonds joined the Illinois National Guard. Upon his enlistment, defendant solemnly swore to support and defend the Constitutions of his country and state "against all enemies" and to bear "true faith and allegiance" to both. Based on this promise, defendant was entrusted with the honor of wearing his country's uniform in the service of his fellow citizens.

But instead of remaining true to that oath—the same expression of fidelity made by the nearly 7,000 servicemembers who, since September 11, 2001, have given this Nation the last full measure of devotion—defendant betrayed both his word and his country by plotting to kill his fellow soldiers on behalf of the so-called Islamic State of Iraq and the Levant. Had this scheme succeeded, we would have been left to mourn yet more victims of ideological terrorism.

Because defendant's actions were a contemptible betrayal of both the Nation's trust and his fellow soldiers, he should be forced to pay a heavy price. To punish defendant for his crimes, to deter future acts of betrayal, and to prevent him from

again waging war against his country for as long as possible, the United States respectfully asks that this Court impose a sentence of 30 years of imprisonment.

**II.     BACKGROUND**

   A.     *Procedural History*

On December 4, 2015, defendant was charged in a superseding information with two counts of conspiring to provide material support to a foreign terrorist organization, specifically ISIL, in violation of 18 U.S.C. § 2339B(a)(1).

On December 14, 2015, under a written plea agreement, the defendant pleaded guilty to both counts of the superseding information. According to the plea agreement, both parties are free to recommend whatever sentence they deem appropriate. Defendant is scheduled to be sentenced on September 20, 2016, at 11:00 a.m.

   B.     *Offense Conduct*

      i.     <u>Initial Meeting With Undercover Agent</u>

Beginning around January 19, 2015, defendant, who was then assigned to a National Guard unit in Joliet, engaged in online communications with UC1, a person who defendant believed was an ISIL fighter in Libya. That person was, in fact, an FBI employee. In those communications, defendant expressed his support for ISIL and his desire to travel to the Middle East to fight for ISIL. Defendant also gave UC1 advice on how to fight and defeat the U.S. military and stated that he and his co-defendant were willing to conduct an attack in the United States if ordered to do so.

For example, on February 2, 2015, defendant told UC1, "For Yunus [Jonas Edmonds] and myself we do both want to touch down in the land and we are coming

2

for jihad fiscibilly[1] Allah. Niether of us mind staying here if those are our orders so long as we get our sisters outta her first. Honestly we would love to do something like the brother in Paris did.[2] Hit here and then go to dawlah inshaAllah. We'll fight where ever need be."

On February 6, 2015, codefendant Jonas Edmonds contacted UC1 online and related his plans to travel to an area of Iraq controlled by ISIL. Jonas Edmonds also told UC1 that if he was unable to travel, he intended to commit an attack within the United States in support of ISIL. Over the next month, Jonas Edmonds asked UC1 for guidance and assistance on defendant's desire to travel to the Middle East to fight for ISIL.

On February 19, 2015, a confidential law enforcement source introduced Jonas Edmonds to UC2, whom Jonas Edmonds believed to be an individual who could assist both defendant and Jonas Edmonds with their plans. In reality, UC2 was an undercover FBI employee.

On March 3, 2015, Jonas Edmonds and UC2 met in person. During the meeting, Jonas Edmonds informed UC2 that he was meeting on behalf of himself and defendant, and that he was looking to assist defendant's travel to the Middle East. Following the March 3, 2015, meeting, Jonas Edmonds and UC2 engaged in a series

---

[1] Throughout this memorandum, quotations to the communications of defendant and Hasan Edmonds are provided verbatim.

[2] Given the context of this and other communications, Hasan Edmonds statement to doing "something like the brother in Paris did" was a reference to a January 7, 2015 terrorist attack in Paris against the satirical newspaper Charlie Hebdo.

of online communications concerning defendant's travel. In an attempt to facilitate defendant's travel to fight for ISIL, Jonas Edmonds asked UC2 for a point of contact to assist defendant when he arrived in the Middle East.

On March 11, 2015, defendant told UC1 that he had purchased a plane ticket to Cairo, Egypt, for the purpose of traveling to fight for ISIL. On March 23, 2015, UC2 met with defendant and Jonas Edmonds in Aurora, Illinois. During this meeting, defendant informed UC2 that he had been watching videos from "brothers from the State," referring to members of ISIL, and that he did not want peace but instead wanted fighting. Also during the March 23, 2015, meeting, Jonas Edmonds informed UC2 that, after Hasan Edmonds traveled, he was planning to attack the Army National Guard installation to which defendant was assigned. Defendant offered to provide Jonas Edmonds and UC2 with a list of the "rankings" of officers to kill, and defendant also confirmed that he would provide Jonas Edmonds with his military uniforms for Jonas Edmonds to wear during the attack on the National Guard base.

ii. <u>Defendant's Surveillance of National Guard Base</u>

On March 24, 2015, defendant and Jonas Edmonds, along with UC2, drove to the National Guard base in Joliet, Illinois, for the purpose of conducting surveillance and planning for the intended attack. During the drive, Jonas Edmonds and defendant discussed with UC2 the purchasing of weapons and how to conduct an attack. More specifically, as the government will explain at the sentencing hearing, defendant advised Jonas Edmonds and UC2 how to ensure both that the attack would

4

be successful and that any efforts by National Guard members to defend themselves could be defeated.

For example, as reflected on a surveillance recording, defendant initially explained the layout of the National Guard base and how to find his unit members during drill: "[S]traight through the lobby [of the base] are two gym doors and, uh, once you go through those doors is where you find everyone in formation standing at parade rest." Defendant then instructed Jonas Edmonds and UC2 on the typical location of his unit's command personnel: "The people you see in front are the leadership . . . the high-ups are the ones who are always standing at the front of formation."

A short while later during the same conversation, defendant explained that his unit would likely not be armed during the intended attack: "[L]ike I said, none of them have firearms though. . . . The most you have to worry about is someone getting up on you with that [presumably referring to unarmed resistance by unit members]." Defendant then reiterated the importance of killing the unit's leadership at the beginning of the attack:

> [T]he first person to take the reins is going to be the first sergeant. And then if he steps off, it's gonna be the company commander. Out of the way. That's the, the head. Kill the head, body follows. . . . [B]efore I leave [meaning travel to Syria], I'll . . . I give him [Jonas Edmonds] the uh, breakdown of the ranks. It's going to be on their hats and on their, on their chest. . . . See the stripes, take the shot.

Shortly after making those statements, defendant, along with Jonas Edmonds and UC2, arrived at the National Guard base so that he could continue the pre-attack surveillance and planning. Defendant described the inside of the installation and

5

which rooms they should avoid during the attack. And to help plan the timing of the attack, defendant entered the National Guard base and retrieved a copy of his unit's training schedule. Later, defendant gave that schedule to Jonas Edmonds so that he could attack the National Guard base on a day when defendant's unit was present and conducting drill.

      iii.    March 25, 2015: Defendant Travels to Support ISIL

On March 25, 2015, at around 3:15 p.m., FBI surveillance agents saw defendant, Jonas Edmonds, and two other individuals place luggage into a minivan at a residence in Aurora, Illinois and depart. Agents then followed the minivan to Chicago Midway Airport. Once there, agents saw defendant get out of the van, which then drove away. Defendant entered the airport with a black backpack and a black roller bag.

At around 5:21 p.m., defendant was arrested after he cleared the airport security checkpoint. During a later search of defendant's luggage, agents found numerous items that UC2 suggested defendant obtain in preparation for fighting in Syria. Also found in defendant's luggage was a handwritten checklist of the items that UC2 had suggested defendant obtain.

After he dropped defendant off at Midway, Jonas Edmonds went to defendant's residence and retrieved several of defendant's National Guard uniforms. Jonas Edmonds planned to use the uniforms as a disguise during the planned attack at defendant's National Guard base.

### III.  STATUTORY SENTENCING RANGE AND GUIDELINES

   *A.  Maximum Statutory Penalties*

Under 18 U.S.C. § 2339B, Count One and Count Two both carry a maximum term of 15 years of imprisonment, a maximum fine of $250,000, and lifetime supervised release. Accordingly, the combined statutory maximum sentence includes a term of imprisonment of up to 30 years, a $500,000 fine, and lifetime supervised release.

   *B.  Sentencing Guidelines*

As set forth at pages 7-9, the PSR's calculations of the relevant Sentencing Guidelines mirror the anticipated Guidelines calculations contained in the written Plea Agreement (Dkt. 57). Defendant concedes that "the calculation of Hasan's sentence guideline is technically correct." (Def. Mem. at 11.) Defendant appears to suggest, however, that the application of Section 3A1.4 of the Sentencing Guidelines (the "terrorism enhancement") would constitute impermissible double-counting and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment. (Def. Br. at 9-14.) Because this suggestion conflicts with governing law, it should be rejected.

As the Seventh Circuit has held, "There is no general rule against 'double counting'; there is only a need for the judge to count as the Guidelines themselves count." *United States v. Ray*, — F.3d —, Nos. 14-3799 & 15-3193, 2016 WL 4011168, at *3 (7th Cir. July 27, 2016). In *Ray*, the defendant, who was convicted of a sex offense, argued that the application of a certain enhancement under the Guidelines

7

was "double counting" because the relevant statute involved the same conduct that supported the enhancement. *Id*. Rejecting this argument, the Seventh Circuit concluded that "the Guidelines permit a single fact to count under more than one Guideline or offense characteristic." *Id*.

*Ray* makes clear that applying the terrorism enhancement does not constitute impermissible "double-counting."[3] Moreover, because the terrorism enhancement can only be applied where the defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (internal quotation marks omitted), a defendant who lacks an ideological agenda can be guilty of providing material support to a foreign terrorist organization but not necessarily eligible for an enhancement under § 3A1.4. Defendant is wrong, therefore, to suggest that the terrorism enhancement leads categorically to double counting.

To the extent defendant makes an Eighth Amendment challenge to § 3A1.4, that argument also fails. Provided that the sentence "is within the statutory limits, a claim of cruel and unusual punishment is normally without merit." *United States v. Jones*, 696 F.3d 695, 699 (7th Cir. 2012) (citing *United States v. Gray*, 611 F.2d 194, 197 n.2 (7th Cir. 1979)).

Defendant's arguments to the side, the PSR calculates a total offense level of 40, and a criminal history category of VI (*see* Guidelines § 3A1.4(b)). Based on these

---

[3] For the reasons stated in *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), defendant's criticism of the Category VI criminal history mandated under § 3A1.4 should be rejected out-of-hand.

w

calculations, the PSR calls for an anticipated Guidelines range of 360 months of imprisonment (*see* Guidelines § 5G1.2(b)). This is in addition to any supervised release and fine the Court may impose.

## IV. CONSIDERATION OF MANDATORY SENTENCING FACTORS

Under 18 U.S.C. § 3553(a), the Court must consider certain factors when determining a defendant's sentence. These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence, and protect the public from further crimes by the defendant; and the need to avoid unwarranted sentencing disparities. In addition, the Court must consider the applicable range under the advisory Sentencing Guidelines. As explained below, these factors support a term of imprisonment of 30 years.

### A. The Nature and Circumstances of these Offenses Justify a 30-Year Sentence

As the government explained in its Sentencing Memorandum for co-defendant Jonas Edmonds, ISIL is a terrorist organization that has dominated headlines for its acts against humanity in Iraq and Syria, and for the vicious, violent, and deadly attacks it inspires and encourages in other parts of the world. Recent notorious examples of ISIL-conducted or -inspired attacks include the Paris attacks of November 13, 2015, where 130 people were murdered; the December 2, 2015 attack in San Bernardino, California, where 14 people were murdered; and the June 12, 2016 Orlando nightclub attack that left nearly 50 dead and as many wounded. Threats from this violent organization continue to impact the entire world.

It was to ISIL that defendant made "bayat"—gave his allegiance. Consistent with his pledge, defendant attempted to travel to the Middle East to further ISIL's violent goals. But defendant was not content merely to enter Syria and fight for ISIL: defendant also wanted his cousin to attack the Joliet National Guard base, and he actively sought to assist that attack. This dastardly conduct weighs heavily in favor of a 30-year sentence.

In his sentencing memorandum, defendant now seeks to minimize his culpability by misstating the purpose of his attempted travel, blaming Jonas Edmonds, and mocking the significance of his own conduct. Among other things, defendant makes the curious assertion that the information he provided for the planned attack was "not particularly unique, nor particularly valuable." (Def. Mem. at 6-9.) This argument distorts the facts and hides the true nature of defendant's conduct.

Defendant's hyperbole includes the misleading assertion that he attempted "to leave this country in the hope of reaching what he thought would be religious paradise." (Def. Mem. at 6.) Defendant may indeed have viewed ISIL-subjugated territory as paradise, but that was not the point of his travel. Rather, as he admitted in open court, defendant "went to Chicago Midway Airport for the purpose of traveling to the Middle East to fight for ISIL." (Dkt. 57, at 7.) Similarly, defendant's statements to undercover agents show that did not expect merely to study religion (*e.g.*, Compl. ¶26 ("we will complete our task or be granted [martyrdom] trying. And yes I look forward to the training. I am already in the american kafir army . . . and now I wish

10

only to serve in the army of Allah alongside my true brothers")). These admissions should be accepted at face value: as the Seventh Circuit has recognized, "Most people would not say that they knocked over a bank, spit on a policeman, or shoved their mother if it wasn't true." *United States v. Watson*, 525 F.3d 583, 586 (7th Cir. 2008). It ought to be self-evident that most people would not say they would die for ISIL if it was not true.

Equally troubling is defendant's effort to trivialize the information he provided to this plot. Defendant speculates that some of the information he provided could have been obtained "during a casual conversation with any Guardsman." (Def. Mem. at 8.) He also blithely asserts that the military rank of Guard members could be "effortlessly procured in mere seconds by a Google© [sic] image search or watching reruns of F Troop." (*Id.* at 9.) That is beside the point. What matters is that defendant provided information to attack his fellow soldiers; that the information might have been available elsewhere does not mitigate defendant's actions or intent.

Defendant's witticisms also ignore the cold reality: these crimes did not occur on television. They were not a fable told by "the press" (*id.* at 5, 9). Defendant's conduct is fact, not fiction, and as defendant admits, he believed the information he provided would benefit ISIL. (*Id.* at 9 (defendant "may have thought at the time that he was being valuable" in providing information to the conspiracy).)

By conducting surveillance, providing valuable operational intelligence, handing over uniforms, and attempting to travel to fight for ISIL, defendant committed heinous crimes. The facts—not defendant's speculations, not his

11

rationalizations—support a 30-year sentence.

### B. A 30-year Sentence is Needed to Protect the Public

In addition to the nature and circumstances of these crimes, a 30-year sentence is needed to incapacitate defendant and to deter him (and others) from committing such acts in the future. Given defendant's careful planning, clear statements in support of ISIL, and affirmative steps, it must be assumed that he will remain a danger to the public for many years. Accordingly, to meaningfully restrict defendant's ability to plan future attacks, defendant should be committed to the Bureau of Prisons for 30 years.

Seeking leniency, defendant now expresses remorse and contends that he is no longer a threat. Not so; when considered in the light of his conduct, neither defendant's pleas nor the speculation that he is no longer a risk justifies a 15-year sentence.

Defendant's professions of remorse may or may not be genuine. Either way, they must be balanced against his conduct before he was arrested. When defendant thought no one was watching, he showed great enthusiasm for joining ISIL and conducting an attack in the United States. Defendant's words were matched by his actions, and this speaks to defendant's future risk with more authority than anything else.

Defendant seeks to portray his conduct in the best light and promises that he is no longer a threat, but these post-hoc justifications are particularly at odds with the profoundly violent statements defendant made before his arrest: "Either we will

12

make it to dowlah or bring the flames of war to the heart [of] this land"; "I am content to fight and die here"; "Until something has to give [either] we get there or we bring the pain to them here"; "Oaths have been given. When the time is right we will strike." Given these bellicose declarations, defendant's newly-asserted pacifism should be viewed skeptically.

The psychological report proffered on defendant's behalf offers little assurance that defendant will no longer be a threat to the public. As the government will explain more fully at sentencing, the report appears to be based on defendant's denials of interest in future violence. But because the report is only as reliable as defendant's word, it does not provide a sufficient basis to conclude that defendant will not recidivate.

On the contrary, both the psychological report and defendant's blame-shifting demonstrate the continued risk he poses to the public. According to the report, defendant did not know about the planned Joliet attack until the day of the surveillance trip, thought other sites presented better targets, and never wanted to commit any violent acts.

The evidence shows otherwise. To begin, defendant first discussed attacking the United States as early as January 24, 2015. (Compl., ¶27.) Moreover, defendant, Jonas Edmonds, and UC2 first discussed the planned Joliet attack on March 23, 2015. (*Id.*, ¶74(b)). Defendant participated actively in that meeting, and at its conclusion, UC2 stated that he wanted to see the base the following day. (*Id.*) The next day— after defendant had a full night to reflect on the plan he actively helped craft—all

three individuals traveled to the Joliet base to conduct surveillance. (*Id.*, ¶75.) This factual record belies defendant's current contention that he did not know about the planned Guard attack until the day of the Joliet trip.

Defendant's mischaracterization of both his role in the Joliet attack planning and his desire to attack the United States undercuts both the extent of his remorse and his assertions that he will not again try to harm this country. So too for the shifting of blame to Jonas Edmonds. Defendant was no one's marionette: he was a voluntary—enthusiastic—participant in this plot. Over the course of several months, defendant introduced Jonas Edmonds to UC1, bought supplies, purchased an airline ticket, conducted pre-operational surveillance, and went to the airport fully expecting to travel to ISIL-controlled territory. Defendant had ample time to reflect upon his actions and to change course, but he did not do so. This Court should reject defendant's attempt to avoid full responsibility for his conduct.

Because defendant plotted actively to harm this country, and because his arguments fail to show that his recidivism risk is low, he should remain incapacitated for the 30 years recommended under the Guidelines. And to the extent the uncertainty of predicting future behavior creates competing risks—that is, the risk to defendant of a too-long sentence versus the risk to society that defendant will again plot to kill in the name of ISIL—the benefit of doubt should be given to the public, not the one who has already demonstrated his danger beyond a reasonable doubt. To protect the public, the Court should impose a sentence of 30 years of imprisonment.

**C.     A 30-Year Sentence Does Not Create an Unwarranted Disparity**

It is true the government is recommending a longer sentence for Hasan Edmonds than for Jonas Edmonds. This does not, however, create an *unwarranted* disparity, because of the simple but distressing fact that defendant plotted to attack the very country he was obligated to protect as a member of the National Guard. In this respect, it is fitting to conclude that defendant levied war against the United States and "adher[ed] to their enemies, giving them aid and comfort." U.S. Const. art. III, § 3.

Defendant's status provided him the access and means to devise a plan for Jonas Edmonds and UC2 to kill as many fellow Guard members as possible. Defendant stole a copy of his Guard drill schedule so that Jonas Edmonds could attack the base on a day when it was occupied. Defendant used his knowledge of the base's layout to ensure that his cousin and UC2 could conduct an effective attack and then escape. And defendant provided his Guard uniforms to Jonas Edmonds so that he, UC2, and any other attackers could remain undetected for as long as possible.[4]

Defendant's exploitation of his status to plot against his country is a significantly aggravating factor, and it justifies a longer sentence than for Jonas

---

[4] Defendant's conduct can be compared to that of Hasan Akbar and Nidal Hasan, two other members of the U.S. Armed Forces who exploited their status as soldiers to murder other soldiers. In March 2003, Hasan Akbar, a sergeant in the U.S. Army stationed in Kuwait, killed two soldiers and wounded fourteen others in a hand grenade and rifle attack on sleeping soldiers. *See* http://www.nbcnews.com/id/7667169/#.Vt0thBsUXmQ (last visited August 17, 2016). In November 2009, Nidal Hasan shot and killed 13 persons and wounded 30 others at Ford Hood, Texas. *See* https://en.wikipedia.org/wiki/Nidal_Hasan (last visited August 17, 2016). Akbar and Hasan have both been sentenced to death for their crimes.

Edmonds. Betraying one's country while in its service is a particularly grave crime; as the government stated at the sentencing of Robert Hanssen, a former FBI agent who was given life imprisonment for espionage, defendant had "an irreducible duty of loyalty to the American people" and owed them "his allegiance, his constancy, and his faithfulness." Violation of this duty is particularly acute when, as here, it involves numerous discrete acts that afforded time for defendant to consider both the criminality and consequences of his acts.

By plotting to wage war on behalf of ISIL, defendant defiled his duty of loyalty. As a result—and when compared to the life sentences imposed for completed attacks identical to what defendant hoped to achieve here—a sentence of 30 years is both reasonable and proportional.

More broadly, a sentence meaningfully informed by the applicable Sentencing Guidelines range helps avoid unwarranted sentencing disparities with other, similarly-situated defendants. Because the Sentencing Guidelines provide an objective sentencing range, they promote the overall goal under 18 U.S.C. § 3553(a)(6) of minimizing unwarranted sentencing disparities. *See*, *e.g.*, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country"). The Supreme Court mandated the advisory Guidelines system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker v. United States*, 543 U.S. 220, 264-65 (2005). To help prevent unwarranted sentencing

disparities with similarly-situated defendants, the Court should impose a Guidelines sentence of 30 years of imprisonment.

## V. CONDITIONS OF SUPERVISED RELEASE

If defendant served the minimum 85 percent of a 30-year term of imprisonment, he would be about 48 years old upon his release. Although it is possible that defendant will renounce his intent to commit violent jihad during his time in prison, it cannot be assumed that he will do so. Given the risk of continued harm from defendant, and to protect the public, the government recommends that the Court impose a lifetime term of supervised release. A period of lifetime supervised release will help deter defendant, under supervision by the Probation Department and with the threat of re-incarceration, from committing further offenses.

To that end, the government recommends the following conditions of supervised release:

**Mandatory Conditions**

- The defendant shall not commit another federal, state or local offense. *See* 18 U.S.C. § 3583(d); Guidelines § 5D1.3(a)(1).

- The defendant shall not unlawfully possess a controlled substance. *See* 18 U.S.C. § 3583(d); Guidelines § 5D1.3(a)(2).

- The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized under 42 U.S.C. § 14135a(a). *See* 18 U.S.C. § 3583(d); Guidelines § 5D1.3(a)(8).

- The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests, and at least two tests thereafter for use of a controlled substance. *See* 18 U.S.C. § 3583(d); Guidelines § 5D1.3(a)(4).

- The defendant shall pay the assessment imposed in accordance with 18 U.S.C. § 3013. *See* Guidelines § 5D1.3(a)(6)(B).

**Discretionary Conditions to Promote Respect for the Law and Deter the Defendant From Committing Future Crimes**

- The defendant shall not leave the judicial district in which the defendant is being supervised without the permission of the court or the probation officer. *See* Guidelines § 5D1.3(c)(1);

- The defendant shall report to the probation officer as directed by the probation officer. *See* Guidelines § 5D1.3(c)(2);

- The defendant shall follow the instructions of the probation officer. *See* Guidelines § 5D1.3(c)(3);

- The defendant shall support the defendant's dependents and meet other family responsibilities. *See* Guidelines § 5D1.3(c)(4);

- The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons. *See* Guidelines § 5D1.3(c)(5);

- The defendant shall notify the probation officer of any change in residence, employer, or workplace within 72 hours. *See* Guidelines § 5D1.3(c)(6);

- The defendant shall not frequent places where he knows controlled substances are illegally sold, used, distributed or administered. *See* Guidelines § 5D1.3(c)(8);

- The defendant shall not meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity. *See* Guidelines § 5D1.3(c)(9).

- The defendant shall permit the probation officer to visit the defendant at home or work at any reasonable time, and to confiscate any contraband in plain view of the officer. *See* Guidelines § 5D1.3(c)(10).

- The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* Guidelines § 5D1.3(c)(11).

- The defendant's employment shall be restricted to the district and division where he resides and/or is supervised, unless approval is granted by the probation officer. Prior to accepting any form of employment, the defendant

shall seek the approval of the probation officer to allow the probation officer the opportunity to assess the level of risk to the community the defendant will pose if employed in a particular capacity.

**Discretionary Conditions to Ensure Safety to Others**

- Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon. *See* 18 U.S.C. § 922(g); Guidelines § 5D1.3(d)(1).

## VI. CONCLUSION

Based on the foregoing, the government respectfully recommends that the Court impose a term of 30 years of incarceration. In addition, the government recommends that defendant be sentenced to a lifetime of supervised release.

    Respectfully submitted,

    ZACHARY T. FARDON
    United States Attorney

By:   */s/ Barry Jonas*
    BARRY JONAS
    JOHN KNESS
    Assistant United States Attorneys
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-5300